UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE T. LAWRENCE | ) | CASE NO. 1:14CV1440 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLIVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Bruce T. Lawrence Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his February 15, 2013 decision in finding that Plaintiff was not disabled because he could perform a significant number of medium jobs in the national economy (Tr. 16-34). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.  **PROCEDURAL HISTORY**

Plaintiff received Supplemental Security Income (SSI) as a child (Tr. 67). The agency re-determined Plaintiff's eligibility for benefits when Plaintiff turned eighteen years of age and informed him that he no longer qualified for benefits (Tr. 67). The agency upheld this decision on reconsideration, and a disability hearing by a State Agency Disability Hearing Officer (Tr. 67).

1

Plaintiff requested a hearing, and, on September 17, 2009, he appeared before the Administrative Law Judge (Tr. 67). On October 27, 2009, the ALJ found Plaintiff not disabled because he could perform a significant number of jobs (Tr. 67-76). In rendering this decision, the ALJ determined that Plaintiff did not meet the requirements of 12.05C because he did not have a valid verbal, performance, or full-scale intelligence quotient (IQ) of 60 through 70 and a physical or other mental impairment that imposed an additional and significant work-related limitation of function (Tr. 70). The ALJ also assigned full weight to a psychological evaluation done by David V. House, Ph.D. on April 19, 2007 (Tr. 70, 72).

Thereafter, Plaintiff filed his current application for SSI on January 4, 2011 (Tr. 138-143). After denials at the initial (Tr. 100-102) and reconsideration (Tr. 108-10) levels, Plaintiff requested an administrative hearing (Tr. 111). He appeared and testified before a different Administrative Law Judge (ALJ) on September 14, 2012 (Tr. 35-56). Gene Burkhammer testified as a vocational expert(Tr. 56-63). On February 15, 2013, the ALJ determined that Plaintiff was not disabled because he could perform a significant number of medium jobs (Tr. 16-34). When the Appeals Council declined to review the ALJ's decision (Tr. 1-3), that decision became the final and binding decision of the Commissioner. Plaintiff seeks judicial review pursuant to 42 U.S.C. Section 405(g).

## II.     STATEMENT OF FACTS

Plaintiff was born on March 8, 1989 (Tr. 153). He has a twelfth grade education and has received special education throughout the majority of his schooling (Tr. 326). Plaintiff's past relevant work experience includes work as a landscaper and dishwasher (Tr. 161).

**III.	SUMMARY OF MEDICAL EVIDENCE**

Plaintiff relies on a number of reports and testing scores from his school years. In 1999, a report (Tr. 177-192) noted that he was a fourth-grade student at Golden Christian Academy, and that he attained a composite score of 84 on the Stanford-Binet Intelligence Scale (Tr. 177). Plaintiff noted the statement in his report that he qualified for a Developmentally Handicapped Program (Tr. 190).

A School Age Evaluation Team Report, that discussed Plaintiff's progress from June to October 2002, included scores from the Wechsler Intelligence Scale for Children – third edition (WISC-III) (Tr. 170). Plaintiff attained a verbal IQ of 67, a performance IQ of 77, and a full scale IQ of 70 (Tr. 170). According to this (unsigned) report, these scores placed Plaintiff's intellectual functioning in the borderline range (Tr. 170). This report also stated that Plaintiff qualified for special education under the category specific learning disability (Tr. 172).

On November 8, 2004, a school psychologist, James F. Mackemull, Ph.D., administered the Kaufman Adolescent and Adult Intelligence Test, and reported a Crystallized IQ in the range 65-75, a Fluid IQ in the range 88-98, and a Composite IQ in the range 76-84 (Tr. 322).

Achievement testing done when Plaintiff was in tenth grade (February 2005) indicated that he had below average skills in all areas tested, except math calculation, which was in the low average range of functioning (Tr. 314). Plaintiff's reading skills were commensurate with someone in the third grade (Tr. 314).

On April 19, 2007. Plaintiff saw David V. House, Ph.D. (Tr. 522-525). Dr. House noted that Plaintiff was eighteen years old and had never worked (Tr. 523). Dr. House observed that Plaintiff's concentration and attention were not especially limited (Tr. 523). Dr. House noted that Plaintiff participated in routine daily household responsibilities (Tr. 524). Dr. House administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), and reported that Plaintiff attained a

3

Verbal IQ of 69, a Performance IQ of 78, and a Full Scale IQ of 71 (Tr. 525). Dr. House determined that these scores placed Plaintiff in the borderline range of adult intellectual functioning (Tr. 525). Dr. House commented, "Mr. Lawrence is not retarded but he does appear to demonstrate at least potential for a verbal learning disorder" (Tr. 525). Dr. House diagnosed a Learning Disorder, Not Otherwise Specified, and Borderline Intellectual Functioning (Tr. 525). Dr. House repeated his statement that concentration and attention were not especially limited, and he opined that Plaintiff's ability to understand and follow directions did not appear to be limited (Tr. 525). Dr. House stated that Plaintiff's ability to withstand stress and pressure was not especially limited, and he said the same thing about Plaintiff's ability to relate to others and deal with the general public (525). According to Dr. House, Plaintiff's level of adaptability was mildly limited, in that he was intellectually limited, especially verbally (Tr. 525). Dr. House also opined that Plaintiff's insight into his current situation and overall level of judgment were mildly limited (Tr. 525). Dr. House assigned a Global Assessment of Functioning (GAF) rating of 60 (indicative of moderate symptoms), based on Plaintiff's mild to moderate reductions in school skills.

On April 22, 2009, Plaintiff saw Peter M. Barach, Ph.D., after Plaintiff pled guilty to aggravated robbery, felonious assault, and carrying a concealed weapon (Tr. 357). Dr. Barach reported that the court had sentenced Plaintiff to five years of community-controlled sanctions (Tr. 357). Dr. Barach entitled his report a "Report for Probation," and stated that one purpose of the report was to determine Plaintiff's eligibility for either the court's Mentally Disordered Offender (MDO) program or the Mentally Retarded Offender (MRO) program (Tr. 357).

Dr. Barach saw Plaintiff for sixty-five minutes, and during that time, he conducted a clinical interview and administered an instrument called the Wechsler Abbreviated Scale of Intelligence (WASI) (Tr. 357). Dr. Barach also had access to past social security records, and noted that in

4

September 2001, SSA awarded benefits to Plaintiff based on dyslexia, borderline intellectual functioning, and attention deficit hyperactivity disorder (ADHD) (Tr. 359).

On the WASI, Plaintiff attained a verbal IQ score of 60, a performance IQ score of 79, and a full scale IQ score of 67 (Tr. 360). Dr. Barach commented on the discrepancy between the verbal and performance scores, but stated that he believed Plaintiff's true full-scale IQ score was between 64 and 72 (Tr. 360).

One of the court-ordered community control sanctions for Plaintiff was that he attend and complete a degree program at Cuyahoga Community College (Tri-C) (Tr. 361). Dr. Barach deemed that sanction unrealistic, and, instead, advised referral for vocational training programs (Tr. 360-361).

According to Plaintiff, he successfully completed drug and alcohol rehabilitation at Matt Talbott Inn in Early 2011 (Plaintiff's Brief at 3, citing Tr. 414). Nevertheless, the narrative summary he cited, dated February 7, 2011, states as follows: "This is a 21 year old African American who has had no treatment and is addicted to cocaine" (Tr. 414). The narrative also noted that, "Client appears unmotivated and has a history of drug sales throughout his adolescence until October 2010, when he was arrested for drug trafficking" (Tr. 414).

On April 28, 2011, Plaintiff saw Herschel Pickholtz, Ed.D., a psychologist, at the request of the Disability Determination Service (Tr. 390-399). This report contained information that contradicted other records. Dr. Pickholtz noted that Plaintiff did not apply to receive vocational rehabilitation in the past (Tr. 393). The report also stated that Plaintiff did not engage in violent behaviors related to crimes in the past (Tr. 393). Dr. Pickholtz seemed to be aware of only one arrest, the one for carrying a concealed weapon (Tr. 393). Dr. Pickholtz reported that Plaintiff had completed rehabilitation for addictive processing, and noted that he had never received vocational, occupational, or physical rehabilitation services (Tr. 391).

5

When Dr. Pickholtz reported a full-scale IQ score of 41, he also noted that in more informal testing, Plaintiff could not count to seven without making an error, and that when asked to say the months of the year backwards, Plaintiff made eleven errors (Tr. 395). Dr. Pickholtz commented on a real discrepancy between Plaintiff's IQ score and his activities of daily living (Tr. 395). Later, Dr. Pickholtz opined that the IQ score of 41 was not an accurate measure of Plaintiff's current levels of intellectual functioning (Tr. 397). Dr. Pickholtz opined that the true level of Plaintiff's intellectual functioning probably feel "in at least the upper end of the borderline range" (Tr. 397). He saw the discrepancy between the IQ score and Plaintiff's functioning as related to exaggeration (Tr. 397). Dr. Pickholtz identified a diagnosis of borderline intellectual functioning, upper end, and a GAF rating of 61 (indicative of mild symptoms ) (Tr. 398-399).

**IV.     SUMMARY OF TESTIMONY**

Plaintiff described himself as a younger individual, who lived with his mother and sister (Tr. 39). He said he did not drive, and that he lost his license because he did not pay for his insurance (Tr. 39). Plaintiff also testified that he got his license suspended (Tr. 39). He testified that he graduated from high school in special education classes (Tr. 39-40).

Plaintiff further testified that his household activities included using the microwave, washing dishes, taking out the trash, and doing light laundry (Tr. 42). He denied doing any shopping (Tr. 42). When asked about hobbies, Plaintiff replied that he went to a recreation center down the street, and that he played basketball or pool there (Tr. 42). He testified that he watched television with his four-year-old daughter (Tr. 43). Although he did not have custody of his daughter, Plaintiff testified that he watched her while the child's mother was at work (Tr. 43).

Finally, Plaintiff stated that he never could keep a job because he would become sidetracked,

had trouble concentrating, and could not finish his assignments (Tr. 45).  He stated that he found it difficult to concentrate (Tr. 45).

Thereafter, Mr. Burkhammer, the vocational expert, testified that he did not see a significant vocational history for Plaintiff (Tr. 57).  Then, the ALJ asked him to consider a person of the same age and education as Plaintiff, who could perform medium work, except that he needed to perform simple, repetitive tasks with simple, short instructions, making simple work-related decisions, and who worked in an environment with few workplace changes (Tr. 57).  This person could not perform at a production quota pace (Tr. 57).  He could engage in superficial interactions with co-workers, supervisors, and the public (Tr. 57).

The vocational expert responded that this person could work as a laundry laborer (600 regional jobs), order puller (600 regional jobs), and janitor (1,000 regional jobs) (Tr. 57). Even if this person required a sit/stand option for about five minutes each hour, he could perform the previously identified jobs as a laundry laborer and janitor (Tr. 58).  The vocational expert eliminated the order puller job, but later stated that five minutes (for the sit/stand option) was not extreme, and, although it would reduce the number of (order puller) jobs available, some employers would tolerate that limitation (Tr. 58).  The vocational expert also testified that a person who was unable to remain focused on their job for an extended period of time, so that at least every hour he needed a ten-minute break, could not work (Tr. 58).

The vocational expert stated that his testimony was consistent with the information in the *Dictionary of Occupational Titles* (DOT) (Tr. 59).  He acknowledged that the DOT did not address the issue of a sit/stand option, but testified that he based that testimony on his experience and collaboration with other professionals (Tr. 59).

7

## V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

**VI.     STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

**VII.     ANALYSIS**

Plaintiff asserts one assignment of error:

WHETHER THE ADMINISTRATIVE LAW JUDGE ERRED AT STEP THREE OF THE SEQUENTIAL EVALUATION IN DETERMINING THAT PLAINTIFF'S IMPAIRMENT(S) DOES NOT MEET, OR AT LEAST EQUAL, THE CRITERIA FOR DISABILITY PURSUANT TO 20 C.F.R. PART 404, SUBPART P, APPENDIX 1, LISTING SECTION 12.05(C).

In her decision, the ALJ observed that on October 27, 2009, ALJ Beekman issued an unfavorable decision on a prior application filed by Plaintiff (Tr. 19). The ALJ noted that the Sixth

Circuit, in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), held that the pricipal of *res judicata* applied, and that the prior ALJ's findings as to a claimant's residual functional capacity (RFC) were binding on the Social Security Administration in the absence of new and material evidence or changed circumstances (Tr. 19). The ALJ found that Plaintiff had submitted new evidence that pertained to a gunshot wound that led to a diagnosis of avascular necrosis in Plaintiff's right hip (Tr. 19). Thus, the ALJ found that Plaintiff was now limited to a range of medium work (whereas the previous ALJ found no physical limitations, or that Plaintiff could work at all exertional levels) (Tr. 19, 71).

The ALJ also found that the new evidence did not change the severity of Plaintiff's impairments to the extent that they would now satisfy the requirements of any listed impairment (Tr. 19). Thus, the ALJ found herself bound by the prior ALJ's findings regarding the Listings (Tr. 19). Plaintiff has not even acknowledged this finding, and he has not challenged it.

In addition, the ALJ considered Listing 12.05C in her decision (Tr. 23-25). The ALJ found that Plaintiff did not satisfy the "A" criteria of Listing 12.05 (Tr. 24). Plaintiff has not challenged that finding. The ALJ also considered 12.05B, but found that although Dr. Pickholtz reported a full-scale IQ score of 41, he also stated that he found such a score inaccurate and opined that Plaintiff's true levels of intelligence would be at the upper end of the borderline range (Tr. 397). Dr. Pickholtz saw a significant discrepancy between the very low IQ score and Plaintiff's ability to engage in relatively normal activities of daily living as related to exaggeration (Tr. 397). Thus, the ALJ correctly found that Plaintiff could not meet or equal the requirements of Listing 12.05B (Tr. 24).

Thereafter, the ALJ found that Plaintiff could not meet the requirements of paragraph "C" of Listing 12.05 because he did not have a valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related

limitation of function (Tr. 24). This language was based upon the prior ALJ's finding regarding this listing. *See* Tr. 70. The ALJ again mentioned the lower scores reported by Dr. Pickholtz, but noted that he found those scores invalid due to exaggeration on Plaintiff's part (Tr. 24-25).

The ALJ addressed the issue again later in her decision. Rather than finding mental retardation, she found Plaintiff limited by borderline intellectual functioning (Tr. 27). That finding is consistent with the diagnosis of Dr. House, who administered the WAIS-III, and reported a Verbal IQ of 69, a Performance IQ of 78, and a Full Scale IQ of 71 (Tr. 525). Dr. House specifically commented that, "Mr. Lawrence is not retarded but he does appear to demonstrate at least potential for a verbal learning disorder" (Tr. 525). Dr. House then diagnosed a learning disorder, not otherwise specified, and borderline intellectual functioning (Tr. 525). In addition, as discussed above, the finding of borderline intellectual functioning is consistent with Dr. Pickholtz's comment that Plaintiff's true levels of intelligence would be at the upper end of the borderline range (Tr. 397). The ALJ included in her analysis compelling evidence of Plaintiff's long-standing history of intellectual disability. The ALJ also recognized Plaintiff's significant limitations due to borderline intellectual functioning.

Plaintiff argues that the ALJ's analysis of various test scores contained in the record and their validity is similarly flawed (Plaintiff's Brief at 7). However, Plaintiff has referred to scores that are not relevant to his current claim. He has referred to IQ testing from 2002 (Plaintiff's Brief at 7). However, the agency found Plaintiff disabled as of 2001, according to Dr. Barach's report (Tr. 359). One of the reasons for finding Plaintiff disabled as a child was borderline intellectual functioning (Tr. 359). This also applies to Plaintiff's citation to a Woodcock-Johnson test result he achieved when he was fifteen years seven months old, because his benefits continued at least until his eighteenth birthday (Tr. 67). Plaintiff maintains that an Individual Education Plan (IEP) from 2007 showed he was several years behind grade level in reading (Plaintiff's Brief at 8, citing Tr. 352). However, this

11

is the third page of a report entitled Medical Somatic Progress Notes (Tr. 349-352).

Since neither the reports of Dr. House nor Dr. Picholtz support his claims, Plaintiff must rely on the report of Dr. Barach, and he asserts that this report is crucial, as it contained a full-scale IQ score of 67, which placed him in the mild mental retardation range (Plaintiff's Brief at 8, citing Tr. 360). However, when the ALJ discussed Dr. Barach's report, she observed that Dr. Barach reported a significant discrepancy between Plaintiff's verbal IQ score of 60 and his performance IQ score of 79 (Tr. 27). The ALJ correctly concluded that the discrepancy resulted from some level of exaggeration by Plaintiff (Tr. 27). Plaintiff challenges this finding, arguing that while Dr. Pickholtz specifically mentioned exaggeration in his report, Dr. Barach said nothing about exaggeration when he saw claimant (Plaintiff's Brief at 10). However, based upon substantial evidence, the ALJ correctly concluded that there was a discrepancy in Plaintiff's scores and Plaintiff's history of polysubstance abuse. The ALJ correctly noted Dr. Barach's recommendation that Plaintiff abstain from (using) illegal drugs, as "use of these substances would result in a return of psychotic symptoms" (Tr. 27, 362). Based upon all of this evidence, the ALJ correctly rejected the IQ scores that Dr. Barach reported, and for accepting Dr. Barach's opinion that Plaintiff's true IQ score "lies between 64 and 72" (Tr. 28). Therefore, based upon substantial evidence, the ALJ correctly found this opinion consistent with Dr. House's opinion and with the pattern of exaggeration that Plaintiff had established over the various testing processes (Tr. 28).

## VIII. CONCLUSION

Therefore, based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual

functional capacity (RFC) to perform a significant number of medium jobs in the national economy, and, therefore, was not disabled.  Hence, he is not entitled to SSI


Dated: February 4, 2016						  */s/George J. Limbert*
						GEORGE J. LIMBERT
						UNITED STATES MAGISTRATE JUDGE